IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:12-cv-01946-JLK

TOG, INC. AND WILD HARVEST, LLC,
on behalf of themselves and all
others similarly situated,

       Plaintiffs,

v.

UNITED STATES POSTAL SERVICE,
INNOVATIONS GROUP, INC., a
Delaware Corporation, and OMAR
DAJANI, an individual,

       Defendants.

---

**DEFENDANT UNITED STATES POSTAL SERVICE'S MOTION TO DISMISS
THE AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM**

---

The Postal Service moves the Court for an order dismissing the amended complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted.

## I.      INTRODUCTION AND OVERVIEW

Plaintiffs operate privately run post offices, called Contract Postal Units ("CPUs"), pursuant to contracts with the Postal Service. In some respects, they can be analogized to franchisees of the Postal Service, but with one key difference — the Postal Service pays plaintiffs to run the CPU "franchises," rather than plaintiffs paying the Postal Service for

that opportunity. The plaintiffs now object to a requirement in their contracts that they purchase mailing labels from a supplier approved by the Postal Service. This is not a case about fixing the price of products that are sold to the public; rather, it is about the administration of the Postal Service's system of contract post offices, which the Postal Service has long used to fulfill its statutory obligation to provide universal mail service, particularly in locations where an official post office would be impractical.

The amended complaint should be dismissed for several reasons. First, the amended complaint fails to state a claim for relief because the Postal Service is not subject to the antitrust laws for the conduct alleged in the amended complaint. As a rule, the Postal Service is exempt from the antitrust laws. *U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 748 (2004). A narrow exception in 39 U.S.C. § 409(e) is not applicable to the conduct alleged to be improper in this case. Section 409(e) allows an antitrust claim only with respect to certain postal "products," a term defined by statute to mean letter and package delivery services (as well as certain related services) that the Postal Service provides to the mailing public in exchange for the payment of postage rates. The Postal Service's Contract Access Retail System ("CARS") and the label rolls at issue in this case are not products and do not have, and could not have, a postage rate. Thus, the Postal Service is not subject to plaintiffs' antitrust claims.

Second, the amended complaint should be dismissed because plaintiffs have failed to allege the most basic elements of a tying arrangement, let alone an unlawful one:

(a) they have not identified a valid "tying" product that is sold by the Postal Service; (b) they have not identified a legally cognizable tying product market; (c) they have not identified a valid "tied" product in the sale of which the Postal Service has a direct economic interest; and (d) they have not identified a legally cognizable tied product market.

The Postal Service raised all these grounds in its motion to dismiss plaintiffs' original complaint. On the deadline for responding to that motion, plaintiffs instead filed their amended complaint pursuant to Federal Rule of Civil Procedure 15(a)(1)(B). Yet even though plaintiffs had full notice of the Postal Service's arguments, their amended complaint barely differs from the first complaint and fails to correct any of the numerous defects identified in the Postal Service's motion. Because these defects are fundamental and plaintiffs have demonstrated their inability to cure them through amendment, the amended complaint should be dismissed with prejudice.

## II.    BACKGROUND[1]

### A.    The Postal Service's Limited Exposure to the Antitrust Laws.

The Postal Service was established by the Postal Reorganization Act ("PRA"), Pub. L. No. 91-375, 84 Stat. 719 (1970), as an independent establishment of the executive branch of the Government of the United States to provide adequate and efficient postal services to all communities at fair and reasonable rates and fees. 39 U.S.C. §§ 101, 403.

---

[1] This statement of facts is based on the allegations in the amended complaint and its attachments, as well as on certain statutes, regulations, and public records that are subject to judicial notice. The Postal Service disagrees with many of plaintiffs' allegations and takes plaintiffs' well-pleaded factual allegations as true only for purposes of this motion to dismiss.

The Postal Accountability and Enhancement Act ("PAEA"), Pub. L. No. 109-435, 120 Stat. 3198 (2006), made substantial changes to the PRA.

As the PAEA's legislative history makes clear, the purpose of the statute was to provide the Postal Service with the "tools to adapt and survive in the face of enormous challenges caused by changing technology and a dynamic communications marketplace." H.R. REP. NO. 109-66, pt. 1 at 44 (2005). In particular, the statute was designed to re-place a "rigid" rate-setting process with one that gives the Postal Service the flexibility to "adapt postal prices and products to a changing marketplace" so that such prices "address the needs of the postal community" and "ensure long-term survival of the American pub-lic's postal system." S. REP. NO. 108-318, at 7-8, 13 (2004). In granting the Postal Ser-vice increased pricing flexibility, however, Congress also sought to ensure a level playing field in those areas where "products" offered by the Postal Service compete with similar products offered by private firms, such as UPS and FedEx.

To balance these twin statutory goals of (a) granting the Postal Service the flexi-bility to meet its responsibilities to the public and (b) providing a level playing field in situations where the Postal Service competes with private firms, Congress made the Post-al Service subject to the antitrust laws, but only to a limited extent. In the PAEA, Con-gress enacted 39 U.S.C. § 409(e), which provides that the Postal Service "shall not be immune under any doctrine of sovereign immunity" and "shall be considered to be a per-son (as defined in subsection (a) of the first section of the Clayton Act) for purposes of

4

*** the antitrust laws" *only* "[t]o the extent that the Postal Service *** engages in conduct with respect to any product which is not reserved to the United States under section 1696 of title 18," the section establishing the Postal Service's statutory monopoly over letter mail. Section 409(e) thus makes clear that for the Postal Service to be subject to the antitrust laws, the suit must concern conduct regarding a postal "product" — a term that is defined by statute to mean a postal service provided to the mailing public in exchange for the payment of postage rates and fees — that competes with similar products offered by private firms.

Congress enacted § 409(e) to ensure that the Postal Service did not have a competitive advantage in the markets where its "products" compete with similar products offered by private firms. *See* S. REP. NO. 108-318, at 27-28 ("The Committee strongly believes that the Postal Service should operate more like a private business but, when competing head to head with a private business, we believe just as strongly that the advantages the Postal Service has as a government entity should be blunted."). As the Senate Committee noted, the antitrust provision was one of several statutory provisions by which Congress sought in the PAEA "to ensure that the Postal Service competes fairly with the private sector, particularly when offering products and services classified as *competitive*." *Id.* at 27 (emphasis supplied).

Despite these changes to the legal standards governing how the Postal Service provides its "products" in the marketplace, Congress did not alter the Postal Service's

statutory responsibility to provide an essential level of postal services to all communities, both urban and rural, at fair and reasonable rates and fees — an inherently governmental function. 39 U.S.C. §§ 101, 403. This requirement includes establishing and maintaining postal facilities that will allow ready access to these essential postal services. *Id.* § 403(b)(3); *see also id.* § 101(g). These provisions, as well as others, set forth the Postal Service's "universal service obligation." *See generally* Postal Regulatory Commission, REPORT ON UNIVERSAL POSTAL SERVICE AND THE POSTAL MONOPOLY (2008) (hereinafter "PRC USO Report").[2]

To ensure that the Postal Service could continue to fulfill its universal service obligation, Congress preserved the Postal Service's traditional statutory monopoly over letter mail and its exemption from the antitrust laws apart from the narrow exception in § 409(e). Congress did so in recognition that if competitive considerations were the Postal Service's primary focus, then it would not be able to provide all citizens with access to an essential level of adequate, affordable postal services because private competition would hinder the Postal Service's ability to adopt "non-market solutions" and to fulfill its statutory obligations. *See* 18 U.S.C. § 1696; 39 U.S.C. § 601; *see also Associated Third Class Mail Users v. U.S. Postal Serv.*, 600 F.2d 824, 826 & n.9 (D.C. Cir. 1979).

In fulfilling its duties regarding universal postal services, the Postal Service must balance social policy considerations with the costs to the Postal Service of providing par-

---

[2] Available at http://www.prc.gov/Docs/61/61628/USO%20Report.pdf.

ticular services. Congress has determined that achieving the policies underlying the universal service obligation is best effectuated by giving the Postal Service discretion in determining how to balance these considerations. *See, e.g.*, PRC USO Report at 3.

### B. The Postal Service's Use of Contract Postal Units ("CPUs") To Fulfill Its Statutory Obligations.

CPUs are a central means by which the Postal Service fulfills its statutory obligation to provide universal access to essential postal services in a cost-effective manner. *See Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 485 (2d Cir. 2009). A CPU is a supplier-owned or leased site, which is operated by the supplier (generally a small business) under a competitively bid contract with the Postal Service. *See id.*; *see also* Am. Compl. ¶ 27. Under these contracts, CPUs are paid by the Postal Service to provide postal services to the public at Postal Service prices. *See, e.g.*, Am. Compl. ¶¶ 23, 24; *id.* Ex. 1 at ¶ 2.1.e & Attachment 4.

In order for a CPU to function, it must have a means to service customers, that is, hardware and software to weigh mail, determine the correct postage rate, and print postal labels evidencing the money customers pay for postage to ship a particular piece of mail or a package, as well as legible bar codes used by the Postal Service in delivering mail. This means is provided to the CPUs, at no cost, by the Postal Service in the form of the Contract Access Retail System, or CARS, described in the amended complaint as a system "for weighing, metering, and calculating postage on mail pieces." *Id.* ¶ 24; *see also id.* Ex. 1 at ¶ 3.9.

CARS incorporates the Postal Service's Postal Evidencing System ("PES"). Because the Postal Service is required to determine the amount of postage and the manner in which it is to be paid, *see* 39 U.S.C. §§ 404(a)(2), (4), the Postal Service created the PES, which generates and prints evidence that postage has been paid using an internal tracking device. 39 C.F.R. § 501.1(a). The PES essentially prints money, so this system is highly regulated by the Postal Service. Any company seeking to manufacture a PES must: (1) seek approval from the Postal Service; (2) ensure that the PES complies with all regulations; and (3) submit the PES to a series of rigorous tests, which must be completed successfully. See 39 C.F.R. §§ 501.3, 501.7, 501.8.

A PES consists of three main components: the Postal Security Device, the indicia printer, and the labels that evidence monetary payment of postage. *See Postage Evidencing Product Submission Procedures*, 67 Fed. Reg. 71,993 (Dec. 3, 2002); *Production, Distribution, and Use of Postage Meters (Postage Evidencing Systems) and Postal Security Devices*, 66 Fed. Reg. 56,435 (Nov. 8, 2001). The Postal Security Device, which calculates the postage for a particular parcel, contains numerous security protocols to protect against theft and fraud. *Id.* The indicia printer is manufactured according to highly technical specifications in order to print evidence of monetary payment of postage as well as legible bar codes used in handling the mail by the Postal Service. *Id.* The indicia printer

must be tamper resistant and contain numerous security protocols. *Id.* The labels are also regulated. *Id.* The PES is tested and approved as a whole unit, including the labels. *Id.*[3]

The CARS units are paid for by the Postal Service and provided to the CPUs without charge. Am. Compl. ¶¶ 24, 37. The CPUs purchase only the consumable portions, such as label rolls. *See id.* ¶ 62. The CARS units allow CPUs to sell Postal Service products to mailers by weighing, metering, and calculating postage on mail pieces and then, using the integrated PES printer, printing the postage indicia. *Id.* ¶ 24. The CARS unit could not function without the PES, making it an integral and necessary part of the overall system.

**C.     This Lawsuit.**

Plaintiffs TOG, Inc. ("TOG") and Wild Harvest, Inc. ("Wild Harvest") are two entities that the Postal Service has contracted with and pays to operate CPUs. *Id.* ¶¶ 3, 4. Both entities signed contracts with the Postal Service that require them to purchase label rolls for their CARS units from a vendor approved by the Postal Service. *Id.* ¶¶ 2, 62-63; *see also id.* Ex. 1 at ¶ 3.9 ("Label Rolls must be ordered from the authorized CARS Provider. Use of any other provider will void the system warranty and the CPU supplier will be liable for all costs incurred to repair CARS."). The approved vendor is Innovations

---

[3] In addition to ensuring that the initial manufacture of the PES complies with Postal Service regulations, any modification requires written approval by the Postal Service before implementation. 39 C.F.R. § 501.10. Once a PES has been manufactured, it may be leased to customers (e.g., large mailers), but can never be purchased by any entity other than the Postal Service. *Id.* § 501.14.

Group, Inc. ("IGI"), which successfully bid and was awarded a contract to provide and service CARS and all its components, including the label rolls. *Id.* ¶¶ 29-34, 50-56.

In this suit, TOG and Wild Harvest allege that the contractual conditions to which they voluntarily agreed, requiring them to purchase label rolls from the approved supplier, IGI, constitute an illegal tying arrangement in violation of the Sherman and Clayton Acts. *Id.* ¶ 2.

On September 25, 2012, the Postal Service and IGI filed separate motions to dismiss plaintiffs' original complaint. On October 16, 2012, the deadline for responding to the motions to dismiss, plaintiffs instead filed an amended complaint pursuant to Federal Rule of Civil Procedure 15(a)(1)(B). The amended complaint, however, is virtually identical to the original complaint. A comparison of the original and amended complaints reveals three notable changes: (1) a single new paragraph consisting only of conclusory legal argument about the possibility of applying postal "rates" to CARS, without any new factual allegations, *see* Am. Compl. ¶ 36; (2) new allegations, not material to any of the issues raised in the Postal Service's motion to dismiss, that IGI's label rolls did not meet Postal Service specifications, *see id.* ¶¶ 54-56; and (3) minor rewording of the paragraphs describing the proposed tying and tied product markets that is non-responsive to the Postal Service's arguments about the invalidity of those proposed markets, *compare id.* ¶¶ 60-61 *with* Compl. ¶¶ 59-60. Plaintiffs' few, half-hearted attempts at repleading their

allegations simply confirm that their suit is fundamentally flawed and should be dismissed.[4]

## III.   ARGUMENT

### A.   Standard of Review.

A suit will be dismissed pursuant to Rule 12(b)(6) if the complaint does not "have enough allegations of fact, taken as true, 'to state a claim to relief that is plausible on its face.'" *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). These allegations must be sufficient to "support[] all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1202 (10th Cir. 2011) (quoting *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007)).

To survive dismissal, the allegations in the complaint must "raise a right to relief above the speculative level." *Kan. Penn Gaming*, 656 F.3d at 1214 (quoting *Twombly*, 550 U.S. at 555). "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice"; rather, "a plaintiff must offer specific factual allegations to support each claim." *Id.* (quoting *Twombly*, 550 U.S. at 555). A court ruling on a motion to dismiss must "disregard all conclusory statements of law" con-

---

[4] Besides the changes described above, the only other revisions plaintiffs made in their amended complaint were insignificant adjustments in phrasing, such as replacing the phrase "CARS Label Rolls from IGI" with "IGI CARS Label Rolls" and the phrase "Non-Certified Label Rolls" with "Non-Tested Label Rolls."  *See* Am. Compl. ¶¶ 4, 57-59, 71, 77, 80(a), 80(e), 105, 106, 108.

tained in the complaint, and it may rely on "judicial experience and common sense" in determining whether the complaint "offer[s] enough specific factual allegations" to state a claim that is "plausible" rather than merely "conceivable." *Id.* at 1214, 1219 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

As the Tenth Circuit has recognized, the need for courts to screen out complaints that fail to state a plausible claim for relief is particularly acute in the antitrust context. "When, in *Twombly*, the Supreme Court emphasized the need for plausibility in the complaint ***, it warned particularly of the high costs and frequent abuses associated with antitrust discovery." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009); *see also Compliance Mktg., Inc. v. Drugtest, Inc.*, No. 09-1241, 2010 WL 1416823, at *3 n.16 (D. Colo. Apr. 7, 2010) (Kane, J.) (granting motion to dismiss antitrust claims and observing that "the *Twombly* court was particularly aware of and concerned with the unusually high cost of discovery in antitrust cases").

If a complaint fails to state a claim, but it appears that the defects in the complaint could be remedied by providing additional or more specific factual allegations, courts will generally dismiss the case without prejudice and afford the plaintiff an opportunity to submit an amended complaint. However, a district court has discretion to dismiss an inadequate complaint with prejudice and without leave to amend "when it would be futile to allow the plaintiff an opportunity to amend his complaint." *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006). And the court's "discretion to deny leave to

amend is particularly broad where [the] plaintiff has previously amended the complaint" and those amendments have failed to correct the defects in the claim. *City of L.A. v. San Pedro Boat Works*, 635 F.3d 440, 454 (9th Cir. 2011) (quoting *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989)); *accord Grossman v. Novell, Inc.*, 120 F.3d 1112, 1126 (10th Cir. 1997) (district court may deny leave to amend for "reasons such as failure to cure deficiencies or futility of amendment" (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962))).

**B.**     **The Postal Service Is Not Subject to the Antitrust Laws with Respect to the Conduct Alleged in the Amended Complaint Because It Does Not Involve Postal "Products."**

The Postal Service is not subject to the antitrust laws for all of its activities. Rather, as explained above, Congress made the Postal Service subject to the antitrust laws only "[t]o the extent that the Postal Service *** engages in conduct with respect to any product which is not reserved to the United States under [the Postal Service's statutory letter mail monopoly]." 39 U.S.C. § 409(e)(1). Thus, for the Postal Service to be subject to suit for alleged antitrust violations, the conduct at issue must relate to conduct in the markets in which postal "products," a term defined in PAEA to mean mailing services provided to the public, compete against similar products offered by private firms. Neither CARS units nor label rolls for CARS are "products" within the meaning of that provision.

"Product" is defined for purposes of title 39 of the U.S. Code as "a postal service with a distinct cost or market characteristic for which a rate or rates are, or may reasonably be, applied." *Id.* § 102(6). This definition, in turn, makes use of two other terms that

have specific meaning in the postal context. First, the term "postal service" refers to "the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto." *Id.* § 102(5). Second, in the postal context, "rates" are "the fee[s] the Postal Service charges for processing, transporting, and delivering a particular type of mail." *United Parcel Serv., Inc. v. U.S. Postal Serv.*, 604 F.2d 1370, 1376 (3d Cir. 1979); *see also* 39 U.S.C. § 102(7) ("'rates,' as used with respect to products, includes fees for postal services"). The plain statutory language thus establishes that the term "product" in § 409(e) is limited to letter and package delivery services (as well as certain related services) that the Postal Service provides to the mailing public and for which it charges postage rates.

Like other equipment and tools used to process and deliver mail, CARS and its components do not qualify as "products" within the plain meaning of the statute. They are not postal services provided to the mailing public in exchange for the payment of postage rates and fees, nor may such equipment and tools reasonably be assigned a rate to charge the mailing public. Rather, CARS units are provided to CPUs to enable CPUs, in turn, to provide existing postal services to the mailing public, by evidencing — through the printing of indicia (which acts essentially as a receipt) — that a mailer utilizing the CPU has paid the requisite postage rates and fees for those services. CARS and the items associated with that system, such as label rolls, are an aspect of the Postal Service's own operations and an integral part of its efforts to fulfill its universal service obligation. They

are not a "product," but rather a way to provide the public with access to existing Postal Service products.

In a feeble attempt to show that the amended complaint falls within the scope of § 409(e), plaintiffs merely paraphrase the statutory definition of "product" and assert, without explanation or support, that "[a] rate or rates may reasonably be applied to" CARS. Am. Compl. ¶ 36. This conclusory recitation of the statutory language utterly fails to demonstrate that CARS qualifies as a postal "product" for purposes of § 409(e). It is "simply a naked legal conclusion, backed by no well-pleaded facts, and as such hardly enough to state a claim for relief." *Johnson v. Liberty Mut. Fire Ins. Co.*, 648 F.3d 1162, 1165 (10th Cir. 2011); *see also Kan. Penn Gaming*, 656 F.3d at 1214 ("in ruling on a motion to dismiss, a court should disregard all conclusory statements of law").

If the statutory definition were not clear enough, further evidence of what Congress considered to be a "product" for purposes of Title 39 is found in the manner in which Congress and the Postal Regulatory Commission ("PRC") have categorized and regulated postal "products." The PAEA requires that all postal "products" be categorized as either "market-dominant products" or "competitive products." 39 U.S.C. § 3642(a). The PAEA sets forth separate regulatory requirements depending on which category a product falls into. *See id.* §§ 102(8)-(9) (market-dominant products are subject to 39 U.S.C. §§ 3621-3629 and competitive products are subject to §§ 3631-3634). These two categories are comprehensive — together, they embrace *all* "products" offered by the

Postal Service. *See id.* § 3642(b)(1) ("The market-dominant category of products shall consist of each product in the sale of which the Postal Service exercises sufficient market power ***. The competitive category of products shall consist of *all other products*." (emphasis supplied)).[5]

Congress provided the initial division of postal "products" into the market-dominant and competitive categories. *See id.* §§ 3621(a), 3631(a). The PRC is required by statute to maintain a list of all of the Postal Service's market-dominant and competitive "products" in a document known as the "Mail Classification Schedule" ("MCS"), and the PRC must approve all new "products" offered by the Postal Service and any transfer of "products" between the market-dominant and competitive categories. *Id.* §§ 3621(b), 3631(c), 3642; *see also* PRC Docket No. RM2007-1, Order No. 43 at 99-104 & Appx. A (Oct. 29, 2007).[6] Except for certain products undergoing a market test under 39 U.S.C. § 3641, the Postal Service is forbidden from providing a "product" that does not appear on either the market-dominant or competitive product list. *Id.* § 3642(e).

Congress identified the postal services that are regulated as "products" (either market-dominant or competitive) as: (1) "first-class mail letters and sealed parcels" and "first-class mail cards" (generally personal and business correspondence); (2) "periodicals" (magazines and newspapers); (3) "standard mail" (advertising mail);

---

[5] Experimental products that are being offered pursuant to a time-limited market test under 39 U.S.C. § 3641 are categorized as market-dominant or competitive, but are regulated under different standards during the course of the test.

[6] Available at http://www.prc.gov/Docs/58/58026/FinalRuleswithTOC.pdf.

(4) "single-piece" (retail) and "bulk" (commercial) "parcel post" (parcels delivered with ground transportation); (5) "media mail" (books and other media sent at a special reduced rate); (6) "bound printed matter" (certain bound materials sent at a special reduced rate); (7) "library mail" (library materials sent at a special reduced rate); (8) "single-piece" and "bulk" international mail; (9) "priority mail" (time-sensitive letters and parcels); (10) "expedited mail" (express mail, primarily overnight mail); (11) "mailgrams" (a now-discontinued product whereby a customer could post a letter at a distant post office through digital means); and (11) "special services" (ancillary mailing services such as insurance, and other services that enhance the value of a piece of mail). *Id.* §§ 3621(a), 3631(a). From this initial list, the PRC established the requisite "product lists" in the MCS. *See, e.g.*, PRC Docket No. RM2007-1, Order No. 43, *supra*, at Appx. A. The MCS product lists have been subsequently amended by the PRC as the Postal Service has introduced new products or transferred products from the market-dominant side to the competitive side.[7]

The vital point is this: Both Congress, in creating the initial lists of market-dominant and competitive "products," and the PRC, in maintaining and updating those lists, have consistently classified as "products" *only* postal services utilized by the mailing public. The means by which the Postal Service interacts with its CPUs and other sup-

---

[7] The most current version of the MCS, which includes those "products" that have been added since 2007, is available at http://www.prc.gov/Docs/71/71852/MCS.pdf.

pliers, including CARS and its components, have never been considered by either Congress or the PRC to be "products" within the meaning of the PAEA.[8]

Consequently, the conduct that the amended complaint alleges violates the antitrust laws is simply not conduct with respect to a "product" at all. Therefore, the conduct does not fall within the scope of § 409(e)'s withdrawal of antitrust immunity. None of the purported "products" identified in the amended complaint (*i.e.*, the CPU itself, CARS, or CARS label rolls) constitute "products" under the statutory definition of that term, as none of them is a service provided to the mailing public in exchange for the payment of rates and fees. Further, and consistent with the plain language of the statutory definition of "products," none of them has been listed by Congress or the PRC as a "product."

Further evidence that Congress did not intend the antitrust laws to apply to the Postal Service in this context is provided by the legislative history of the PAEA. In particular, Congress in enacting § 409(e) sought to ensure that the Postal Service did not have a competitive advantage in the markets where its "products" compete with similar products offered by private firms (such as UPS and FedEx). *See, e.g.*, H.R. REP. NO. 109-66, pt. 1 at 44. Such products are simply not involved in this case.

---

[8] The point that "rates" apply only to mail and related services is further demonstrated by reviewing the statutory factors that the PRC must consider when determining appropriate rates — factors that refer to "mail," "delivery of mail," "sender[s]" and "recipient[s]" of mail, "mail volume," "delivery of mail matter," "classes of mail," etc. 39 U.S.C. § 3622(c). The factors do not include references to equipment, such as CARS, that the Postal Service utilizes in processing mail.

In contrast to the Postal Service's provision of its "products" in the competitive marketplace, in fulfilling its universal service obligation (which was not altered by the PAEA), the Postal Service is primarily governed by social policy considerations. *See, e.g.*, *Flamingo Indus.*, 540 U.S. at 747 (the Postal Service has "nationwide, public responsibilities" that differ from "private enterprise," including "broader obligations" such as universal mail delivery). For instance, in establishing a network of retail facilities, of which CPUs are an essential part, the Postal Service is required to balance the costs to the Postal Service ("reasonable economies of postal operations") with ensuring that there is "ready access to essential postal services" for all communities. 39 U.S.C. § 403(b)(3); *see Cooper*, 577 F.3d at 492-93 ("Congress granted to the USPS the exclusive duty to create and operate Post Offices with responsibility to accept and process mail, sell postal products, and, of course, participate in the safe carriage of mail. As to safe carriage, Congress has conferred to the Postal Service a complete monopoly. That monopoly entails the sale of postage for letters, acceptance of mail for transmission, and the marking and processing of mail for delivery: all functions performed by *** CPUs."). By limiting the scope of § 409(e) to the Postal Service's non-monopoly "products," Congress clearly did not intend to have antitrust law affect the ability of the Postal Service to achieve these unique statutory obligations.[9]

---

[9] Courts have recognized that, even absent an explicit statutory exemption, the antitrust laws do not apply in situations in which their focus on uninhibited competition conflicts with the achievement of other social policies enunciated by Congress. *See, e.g.*, *McCarthy v. Middle*

The only harm the amended complaint alleges is with respect to the costs incurred by CPUs pursuant to their contractual relationship with the Postal Service. *See* Am. Compl. ¶¶ 126, 138, 150, 157. This alleged injury is not something that Congress contemplated would provide the basis for an antitrust suit against the Postal Service under § 409(e): The relationship between the Postal Service and its suppliers that operate CPUs does not implicate Congress's concerns about the Postal Service engaging in anti-competitive behavior with respect to its non-monopoly "products." Indeed, allowing plaintiffs to utilize the antitrust laws to regulate the means by which the Postal Service contracts with suppliers to operate contract post offices would place adherence to the precepts of antitrust above the statutory policies that Congress has expressly required the Postal Service to consider in 39 U.S.C. §§ 101 and 403 when establishing retail facilities.

Because this amended complaint does not involve a "product" and thus does not allege any conduct for which the Postal Service is subject to suit under the antitrust laws pursuant to § 409(e), it must be dismissed.[10]

---

*Tenn. Elec. Membership Corp.*, 466 F.3d 399, 414 (6th Cir. 2006); *Behagen v. Amateur Basketball Ass'n of U.S.*, 884 F.2d 524, 527-30 (10th Cir. 1989).

[10] Even if the Postal Service could be sued under the antitrust laws for the conduct alleged in the amended complaint, plaintiffs' demand for "a trial by jury on all issues so triable," *see* Am. Compl. at 33, still would be unavailing. As "an independent establishment of the executive branch of the Government of the United States," 39 U.S.C. § 201, the Postal Service is a constituent part of the Federal Government, *Flamingo Indus.*, 540 U.S. at 744, and it "has long been settled that the Seventh Amendment right to trial by jury does not apply in actions against the Federal Government." *Lehman v. Nakshian*, 453 U.S. 156, 160 (1981). As the Supreme Court explained, because "there is no generally applicable jury trial right that attaches when the United States consents to suit," the "appropriate inquiry *** is whether Congress clearly and unequivocally *** granted a right to trial by jury." *Id.* at 162 & n.9. Section 409(e) of the PAEA subjects

**C.**   **Even If the Antitrust Laws Applied, the Amended Complaint Would Fail To State a Plausible Claim Under Those Laws.**

Although the amended complaint pleads violations of both the Clayton Act (Counts I and II) and the monopolization and restraint-of-trade provisions of the Sherman Act (Counts III and IV), all of plaintiffs' claims are based on an allegedly unlawful tying arrangement. *See, e.g.*, Am. Compl. ¶ 2. Accordingly, this Court need not separately analyze each cause of action, but need only consider whether plaintiffs have pleaded sufficient factual allegations to raise a plausible inference of an unlawful tying arrangement.[11]

A tying arrangement is "an agreement by a party to sell one product" — the "tying product" — "only on the condition that the buyer also purchase a different (or tied) product." *Abraham v. Intermountain Health Care, Inc.*, 461 F.3d 1249, 1263 (10th Cir. 2006). The elements of an illegal tying arrangement are "(1) two separate products, (2) a tie — or conditioning of the sale of one product on the purchase of another, (3) sufficient economic power in the tying product market, and (4) a substantial volume of commerce affected in the tied product market." *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 63 F.3d 1540, 1546 (10th Cir. 1995). In addition, if the alleged tying and tied products are sold by different parties, the plaintiff must establish that the tying product seller has a "direct economic interest in the sale of the tied

the Postal Service to antitrust liability in certain cases, but it does not grant a right to trial by jury in those cases.

[11] The analysis of plaintiffs' claims for unlawful tying is the same whether the claims are pleaded under the Clayton Act (Counts I and II) or the Sherman Act (Counts III and IV). *See, e.g.*, *De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 70 (2d Cir. 1996).

product." *Abraham*, 461 F.3d at 1265-66 (quoting *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 888 (10th Cir. 1997)).[12]

Here, plaintiffs accuse the Postal Service of creating an unlawful tie-in between "the CARS System (the Tying Product)" and "IGI CARS Label Rolls (the Tied Product)." Am. Compl. ¶ 2. They likewise allege that "[t]he relevant Tying Product market is users of the CARS System," and "[t]he relevant Tied Product market is the CARS Label Roll market." *Id.* ¶¶ 60-61. Plaintiffs, however, have failed to allege the most basic elements of a tying arrangement — let alone an unlawful one. Plaintiffs' allegations regarding the tying product are deficient, as they have not alleged that the Postal Service sells the alleged tying product and have also failed to identify a valid tying product market. Their allegations regarding the tied product are similarly deficient, as they have not alleged that the Postal Service sells or has a direct economic interest in sales of the tied product and have not identified a valid tied product market. Accordingly, even if the antitrust laws apply, plaintiffs' amended complaint must be dismissed for failure to state a claim. Plaintiffs' feeble attempts to reword their allegations regarding the tying and tied

---

[12] A tying arrangement with these characteristics is generally deemed unlawful "per se," without further analysis of its effect on competition in the tied product market. *E.g.*, *Multistate Legal Studies*, 63 F.3d at 1546. A "rule of reason" analysis may also apply to tying arrangements "in some instances," requiring consideration of their pro- or anti-competitive effects. *Compliance Marketing*, 2010 WL 1416823, at *9 (citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984), *abrogated in part on other grounds*, *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006)). The distinction is of no importance in this case, as plaintiffs' antitrust claims fail under either a per se or rule of reason analysis.

product markets in response to the Postal Service's motion to dismiss, *compare id. with* Compl. ¶¶ 59-60, do not come close to curing the fundamental flaws in their claims.

*First*, plaintiffs do not allege a valid tying product. The essence of a tying arrangement is that "the *sale* of one product" is conditioned on "the purchase of another." *Multistate Legal Studies*, 63 F.3d at 1546 (emphasis supplied). As this Court has recognized, something that is not sold cannot be a tying product. *See Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1093-94 (D. Colo. 2004) (finding "a legitimate dispute of fact whether [radio] air play and promotional support are actually sold, and, therefore, could potentially be considered [tying] products"); *see also Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*, 903 F.2d 988, 991 (4th Cir. 1990).

Here, the amended complaint — like the original complaint — never alleges that the Postal Service sells CARS to CPU operators. Instead, plaintiffs are careful to allege only that CARS is "distributed" or "provided" to CPUs. *E.g.*, Am. Compl. ¶¶ 44, 49, 52, 60. This failure to allege a critical element of a tying arrangement — the sale of the alleged tying product — is not inadvertent: as the contract attached to the amended complaint makes clear, the Postal Service provides CARS to CPUs free of charge. *See* Am. Compl. Ex. 1 at ¶ 3.9.

Nor does the amended complaint even allege that CPU operators pay for the opportunity to become CPUs. That is not how the CPU system works: CPUs are not cus-

tomers of the Postal Service, but rather vendors whom the Postal Service hires and pays to operate privately run post offices. *See, e.g.*, *id.* Ex. 1 at Attachment 4 (form for supplier to propose the "price" for which it will "agree[] to operate the [CPU]"). Even if one analogizes CPUs to franchisees or distributors for the Postal Service, that analogy is of no help to plaintiffs, because they do not allege that they pay the Postal Service any franchise fee. *See, e.g.*, *McLaughlin Equip. Co. v. Servaas*, No. 98-127, 2004 WL 1629603, at *17 & n.11 (S.D. Ind. Feb. 18, 2004) (suggesting that "distributorship rights" cannot constitute a tying product absent a "franchise fee").

*Second*, even if CARS could somehow qualify as a tying product even though the Postal Service does not sell it and plaintiffs do not buy it, plaintiffs have not alleged a valid relevant market for that product. The boundaries of a relevant product market are defined by "reasonable interchangeability." *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1131 (10th Cir. 2002). Plaintiffs, however, allege a tying market consisting exclusively of the market for a specific piece of equipment that is provided (free of charge) to CPU operators. This is equivalent to defining a market consisting only of a single branded product, which the Tenth Circuit and other courts have held is not permissible. *See, e.g.*, *Green Country Food Market, Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1282 (10th Cir. 2004) ("In general, a manufacturer's own products do not themselves comprise a relevant product market."); *TV Commc'ns Network, Inc. v. Turner Network*

*Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir. 1992) ("a company does not violate the Sherman Act by virtue of the natural monopoly it holds over its own product").

To be sure, the Tenth Circuit has acknowledged that there are "rare circumstances" in which "products of a single manufacturer" can constitute a relevant market. *Green Country*, 371 F.3d at 1283. However, those circumstances exist only where buyers are "locked into" purchasing that manufacturer's products. *Id.* (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 481-82 (1992)). Plaintiffs do not allege that they were in any way "locked into" becoming CPUs or obtaining CARS. Thus, they have failed to plead a relevant tying product market.[13]

***Third***, plaintiffs fail to identify a valid tied product. Their proposed tied product is "IGI CARS Label Rolls," but they do not allege that the Postal Service — the alleged tying seller — sells or has a "direct economic interest in the sale of" IGI label rolls. *Abraham*, 461 F.3d at 1265-66 (quoting *Sports Racing*, 131 F.3d at 888). They do not claim that the Postal Service receives a share of IGI's profits from selling label rolls or that it receives commissions or rebates tied to IGI's sales of label rolls (and the Postal Service

---

[13] If plaintiffs' new allegation in their amended complaint that "there is no substitute or interchangeable system that can be used by CARS CPUs in place of the CARS System," Am. Compl. ¶ 61, is an attempt to justify plaintiffs' proposed single-product tying market, it is unavailing. Of course "CARS CPUs" have no alternative to using "the CARS System," because their contracts require them to do so and because if they did not use CARS, they would not be CARS CPUs. But plaintiffs do not allege that they were in any way "locked in" to becoming CARS CPUs in the first place. *Cf. United Farmers Agents Ass'n v. Farmers Ins. Exchange*, 89 F.3d 233, 236-37 (5th Cir. 1996) (rejecting proposed market consisting of "a single brand (Farmers) and a tying product (electronic access to policy information) that has never been available to anyone other than Farmers agents" and holding that "the relevant market is the market for insurance sales," not the "market" for electronic equipment and access that Farmers provides to its agents).

receives neither). Instead, they allege only that the Postal Service receives some unspecified contractual benefit from the tying arrangement as a whole — a benefit that plaintiffs do not allege is linked directly to how many label rolls IGI sells. *See* Am. Compl. ¶ 97 (alleging that Postal Service receives "discount, rebate or lower prices under the IGI Contract *** in return for" creating the tie-in). This vague and conclusory allegation — which plaintiffs did not attempt to revise or expand in their amended complaint, *compare id. with* Compl. ¶ 96 — falls far short of satisfying the direct economic interest requirement.

Even if it were proven that the Postal Service had received more favorable terms under its contract with IGI in exchange for creating the alleged tie-in, such "attenuated *** indirect economic benefits" would not satisfy "the 'direct economic interest' requirement." *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001). A plaintiff "does not establish the requisite economic interest *** merely by alleging that the tying seller is receiving a profit from the transaction as a whole." *Carl Sandburg Vill. Condominium Ass'n No. 1 v. First Condominium Dev. Co.*, 758 F.2d 203, 208 (7th Cir. 1985); *see also Crawford Transp. Co. v. Chrysler Corp.*, 338 F.2d 934, 939 (6th Cir. 1964) (car company that "benefited financially" from exclusive contract with vehicle transportation carrier but "received no direct profits" from the carrier did not have a direct interest in carrier's sales); *Beard v. Parkview Hosp.*, 912 F.2d 138, 140 (6th Cir. 1990) (hospital that benefited from exclusive contract with radiologist but did not share

in his fees did not have a direct interest in sale of radiologist's services); *Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Sys., Inc.*, 732 F.2d 1403, 1408 (9th Cir. 1984) (airline that benefited from "fly-drive package" but did not receive a share of car rental fees did not have a direct interest in sale of car rentals).

Like the plaintiffs in those cases, plaintiffs here allege only that the Postal Service received some general benefit from the tying arrangement as a whole under its contract with IGI, not that it has a direct interest in IGI's sales of label rolls. If all the direct economic interest test demanded was that the tying seller receive some benefit from the overall transaction, then it is hard to imagine a case where the test would not be satisfied — the tying seller presumably must benefit in some way, or else it would not enter into the transaction. But a seller who merely receives a general benefit from the tying agreement as a whole, but does not receive any *direct* economic benefit from *sales* of the tied product, is not "attempting to invade the alleged tied product or service market in a manner proscribed by" the antitrust laws. *Beard*, 912 F.3d at 142.[14]

*Fourth*, even if IGI label rolls were a valid tied product despite the fact that the Postal Service does not sell them or have a direct economic interest in IGI's sale of them, the amended complaint would still fail to state a claim because it does not define a legally cognizable tied product market. Plaintiffs' proposed tied product market is "the CARS

---

[14] Moreover, plaintiffs' allegations that IGI had to use "force, threats and intimidation" to "force continuation of the tying arrangement" by the Postal Service, Am. Compl. ¶¶ 75-76, are inconsistent with any notion that the Postal Service had a direct economic interest in IGI's label roll sales.

Label Roll market ***, sold to CARS CPUs." Am. Compl. ¶ 61. By defining the product market as limited to labels that are "sold to CARS CPUs," plaintiffs are attempting to artificially limit the market to only those label rolls that can be sold to a particular group of customers, CARS CPUs, whose contracts with the Postal Service require them to purchase label rolls only from a particular vendor, IGI. This is not a valid market because "contractual restraints assumed by a particular plaintiff" cannot define the boundaries of an antitrust market. *Queen City Pizza v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997).

Courts have consistently rejected similar attempts to limit an antitrust market to a group of customers whose ability to choose among interchangeable products is limited by their contractual obligations. In *Queen City Pizza*, the Third Circuit rejected antitrust claims based on contractual provisions requiring Domino's franchisees to purchase pizza ingredients from approved suppliers, holding that "ingredients, supplies, materials, and distribution services used by and in the operation of Domino's pizza stores" did not constitute a relevant market. *Id.* at 437. Similarly, the Ninth Circuit "rejected *** plaintiffs' attempt to limit [a] relevant market to acute care hospitals used by Humana insureds" who were required to use certain hospitals by "contractual provisions in their insurance policies." *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997), *overruled in part on other grounds*, *Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012); *see also Bansavich v. McLane Co.*, No. 07-702, 2008 WL 4821320, at *3 (D. Conn. Oct. 31,

2008) (rejecting proposed market consisting of products sold to Mobil franchisees, who were contractually bound to purchase products from particular suppliers). As those courts have recognized, "[e]conomic power derived from contractual agreements such as franchises *** has nothing to do with market power, ultimate consumers' welfare, or antitrust." *United Farmers Agents Ass'n v. Farmers Ins. Exchange*, 89 F.3d 233, 236-37 (5th Cir. 1996) (internal quotation marks omitted).

Plaintiffs' limitation of their proposed tied product market to products "sold to CARS CPUs" suffers from the same defects that required dismissal in those cases. Plaintiffs are attempting to define the boundaries of the relevant market based on the "contractual restraints assumed by" CPU operators in their contracts with the Postal Service, *Queen City Pizza*, 124 F.3d at 438, and thereby to exclude other products that are, according to their own amended complaint, reasonably interchangeable, but that CARS CPU operators are contractually prohibited from purchasing. Indeed, as in *Queen City Pizza*, "it is the [alleged] availability of interchangeable [label rolls] *** that motivates this lawsuit." *Id.* Accordingly, the amended complaint fails to identify a valid tied product market.[15]

---

[15] In their amended complaint, plaintiffs attempt to mask this fundamental problem with their tying claim by stating that their proposed tied product market includes not only "IGI CARS Label Rolls," but also other "interchangeable" label rolls that, they acknowledge, CARS CPUs are contractually prohibited from purchasing. Am. Compl. ¶ 61. Yet in the very same sentence, plaintiffs contradict themselves by limiting their proposed market to label rolls that are "sold to CARS CPUs." *Id.* Plaintiffs cannot define the relevant market to exclude reasonably interchangeable products, regardless of whether they attempt to do so by excluding those products

For each of the above reasons, even if the antitrust laws apply to the conduct alleged here, the amended complaint fails to state a viable claim under those laws.

## IV.   CONCLUSION

The amended complaint should be dismissed because it does not state a claim for relief. First, § 409(e) permits an antitrust action against the Postal Service only with respect to its "products," and the statute makes clear that "products" are mailing services that the Postal Service provides to the public and for which it charges postage rates — not items provided to postal contractors to enable them to serve the mailing public, such as CARS and its label rolls. Further, even if plaintiffs' claims fall within § 409(e), the amended complaint should be dismissed because plaintiffs have failed to identify a valid tying or tied product that the Postal Service sells (or in sales of which it has a direct economic interest) and have similarly failed to plead legally cognizable tying or tied product markets. Finally, because the defects in plaintiffs' tying claims are fundamental, and because plaintiffs' amended complaint demonstrates that they are unable to cure those defects even after receiving full notice of the Postal Service's arguments, allowing further amendment would be futile. The Court should therefore dismiss the amended complaint with prejudice.

---

explicitly or by limiting the market to products that are "sold to" a class of customers who are contractually bound not to purchase those products.

Respectfully submitted,

R. Andrew German
  *Managing Counsel*

Stephan J. Boardman
  *Chief Counsel, Appellate and*
  *Commercial Litigation*

Of counsel
Keith E. Weidner
  *Chief Counsel,*
  *Legal Policy and*
  *Legislation*

Janine Castorina
  *Attorney, Appellate and*
  *Commercial Litigation*
U.S. Postal Service
475 L'Enfant Plaza, S.W.
Washington, D.C. 20260-1150
202-268-3069
janine.castorina@usps.gov


  *s/ Jeffrey S. Bucholtz*
  _____
Jeffrey S. Bucholtz
Graciela M. Rodriguez
Brian R. Meiners
Paul A. Mezzina
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone: (202) 737-0500
Facsimile: (202) 626-3737
jbucholtz@kslaw.com

*Attorneys for Defendant United States*
*Postal Service*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 26th day of October, 2012, a true and correct copy of the foregoing **DEFENDANT UNITED STATES POSTAL SERVICE'S MOTION TO DISMISS THE AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM** was served electronically with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following email addresses:

Denise D. Riley
Daniel E. Friesen
Christine Lamb
Stephen DeHoff
Friesen Lamb, LLP
1675 Larimer Street, Suite 675
Denver, CO 80202
driley@friesenlamb.com
dfriesen@friesenlamb.com
clamb@friesenlamb.com
sdehoff@frisenlamb.com

Kathryn A. Reilly
HUSCH BLACKWELL LLP
1700 Lincoln Street, Suite 4700
Denver, CO  80203
kathryn.reilly@huschblackwell.com

By: _s/ Jeffrey S. Bucholtz_

Jeffrey S. Bucholtz