**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.:  12-cv-1946-JLK

TOG, INC. AND WILD HARVEST,
LLC, on behalf of themselves and all
others similarly situated,

      Plaintiffs,

v.

UNITED STATES POSTAL SERVICE,
INNOVATIONS GROUP, INC., a
Delaware corporation, and OMAR
DAJANI, an individual

      Defendants.

---

**PLAINTIFFS' RESPONSE TO UNITED STATES POSTAL SERVICE'S
MOTION TO DISMISS FIRST AMENDED COMPLAINT**

---

      Plaintiffs TOG, Inc. and Wild Harvest, LLC  (hereinafter "Plaintiffs") respond to

the United States Postal Service ("USPS") [1] Motion to Dismiss the Amended Complaint

("Motion") and state as follows:

---

[1] Plaintiffs defined and utilized multiple terms in the Amended Complaint, and use those defined terms herein.

## INTRODUCTION

The parties are in agreement on many issues.  For example, it is undisputed that CPUs help serve the USPS's statutory obligation to provide universal access to postal services, in particular in small and rural communities where the cost of a brick and motor post office would be impractical and particularly costly to USPS.  Indeed, the cost to USPS of providing access to postal services through CPUs is significantly lower than providing those services itself.  It is "estimated that in fiscal year 2011, [USPS] incurred $0.17 in costs for each dollar of revenue at CPUs and $0.51 in costs for each dollar of revenue at post offices."  *See U.S.* Government Accountability Office, CONTRACT POSTAL UNITS, Analysis of Location, Service, and Financial Characteristics, 2012 ("GAO Nov. 2012 Report"), p. 8.[2]  The USPS lost over 15.9 billion dollars for fiscal year 2012.  *See* United States Postal Service Form 10-K, Nov. 15, 2012.[3]  Some have suggested that CPUs and other alternative access channels may be the best, if not only, way for the USPS to survive.  One would think that where your partner companies are saving you 67% of every revenue dollar generated, the USPS would go out of its way to help, not hurt, these partners.[4]  Unfortunately, that is the heart of this matter.  USPS has

---

[2] Available at http://www.gao.gov/products/GAO-13-41
[3] Available at http://about.usps.com/who-we-are/financials/10k-reports/fy2012.pdf
[4] USPS makes much of the fact that it "pays" CPUs for the privilege to operate a CPU, insinuating that it is not profiting from the relationship.  The way CPUs operate is that each unit is required to pre-pay for stamps and metered postage it sell to patrons.  USPS then reimburses the CPU at specified percentages.  The reimbursement rates for each CARS CPUs average

imposed a tying arrangement and created a monopoly in the CARS Label Roll market, all at the cost of these small business CPU partners who provide them and the U.S. public an invaluable service.

Plaintiffs and USPS agree on another point: the key inquiry on this Motion to Dismiss is whether or not Congress has waived USPS's sovereign immunity on antitrust claims for the actions alleged in the Amended Complaint. If USPS is not sovereignly immune, it is beyond question that the allegations in the Amended Complaint state a claim for per se violations of both the Clayton and Sherman Acts.  The allegations are sufficient to state a claim on which relief could be granted, requiring denial of the Motion to Dismiss.

## ARGUMENT

### I.    Standard for Motion to Dismiss

When reviewing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB–TV, L.L.C.,*

---

between 9% and 12%.  GAO Nov. 2012 Report, p. 23.  These "payments" result in a very narrow, if not negative, margin for the CPUs, especially in light of the exorbitant cost imposed on the CPUs because of the tying arrangement at issue in this case.  For each metered package the CPU must print the metered postage on the label (1.5 inches of meter tape) as well as a separate internal USPS tracking label (2 inches of meter tape) for most packages.  The CARS Label Rolls measure 230 feet per roll, at a cost of $70 per roll for IGI Label Rolls, the tied product.  These labels alone cost $.088 per package.  To cover *just this cost* that is paid directly by the CPU, the postage needed to permit the CPU operating at a 10% rate *to break even* $.53 to $.88 per package, more than the postage required for a first class letter.  This in addition to all the other overhead costs covered by CPUs (and not by the USPS). USPS's claim that it is not making money on the backs of these CPUs disingenuous, at best.

493 F.3d 1210, 1215 (10th Cir. 2007) (citing *David v. City & County of Denver,* 101 F.3d 1344, 1352 (10th Cir. 1996)). A complaint must set forth a plausible, not merely a possible, claim. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal,* 556 U.S. 662 (2009). "The concept of 'plausibility' at the dismissal stage refers not to whether the allegations are likely to be true; the court must assume them to be true. The question is whether, if the allegations are true, it is plausible and not merely possible that the plaintiff is entitled to relief under the relevant law." *Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1191-92 (10th Cir. 2009).

Plaintiffs have alleged substantial direct evidence of Defendants' Sherman and Clayton Act violations. Indeed, the purchase of the tied product as a condition of the provision, use and sale of the tying products is set forth in writing in the CARS CPU contract, and in daily messaging sent through the CARS System by the Defendants. *See* Amended Complaint ¶¶ 2-4; 38; 62-65; 71-81; 91-104. Because factual allegations must be accepted as true for purposes of a motion to dismiss, *Twombly*, 550 U.S. at 556, it is difficult to conceive of a situation where a complaint simultaneously alleges direct evidence of Sherman Act and Clayton Act violations but fails to present a claim for these same violations that is plausible on its face. Here, because of the substantial direct evidence of Defendants' unlawful behavior, Plaintiffs' Complaint meets the pleading requirements as set forth in *Twombly*.

USPS does not challenge the sufficiency of the factual allegations of the Complaint, or that if proven these facts would constitute antitrust violations.  Instead, USPS claims that any antitrust violations should be ignored because it is immune from liability pursuant to the doctrine of sovereign immunity.  Because Congress has expressly waived USPS's sovereign immunity for the conduct alleged, the motion to dismiss must fail.

## II.    USPS Does Not Have Immunity from Antitrust Liability for the Conduct Alleged in the Amended Complaint.

### A.    Summary of Argument

USPS claims that its antitrust violations should be ignored because it is sovereignly immune from antitrust liability.  However, in 2006, through the Postal Accountability and Enhancement Act ("PAEA"), Pub. L. No. 109-435, 120 Stat. 3198 (2006), Congress specifically stripped USPS of sovereign immunity from the antitrust laws.[5]  The PAEA is an act of Congress that waived USPS's immunity from all conduct, with the exception of one narrow category of conduct – the carriage of letter mail over postal routes.  39 U.S.C. § 409(e) (waiving sovereign immunity for "conduct with respect to any product which is not reserved to the United States under section 1696 of title 18, the statutory letter mail monopoly).  USPS's argument for sovereign immunity is four-fold:

---

[5] The USPS argument is largely based on a 2004 Supreme Court case, *United States Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 748 (2004) that was abrogated by statute through the PAEA.

First, USPS tries to claim that its conduct in fulfilling it universal service obligations are not "postal services" and therefore cannot be a "product" as defined by the statute.  This is logically impossible upon review of the statute as a whole, which makes all services provided by USPS "postal services."  They are therefore a "product" if a rate is or could be applied.  39 U.S.C. §102(6)

Second, USPS attempts to overcome the broad waiver of immunity by rearranging the words of the statute and embedding non-existent words into its argument for statutory misinterpretation.  It claims that that sovereign immunity is waived only on only a narrow category of items rather than what is written in the statute – a complete waiver as to all products, with one very narrow and limited exemption – the postal monopoly.  USPS, by re-wording the statute and placing the waiver first, attempts to change the waiver to be modified by the exception, rather than reading the law for what it is – a blanket waiver of sovereign immunity with one limited exception.  *See* Motion at 4-5.

Third, USPS claims that there is no "product" alleged to be part of the tying arrangement as that term is defined in the PAEA.  USPS ignores that Plaintiffs have plead that one of the "tying products" is postage, sold by USPS to the CARS CPU's under their contracts.  Am. Comp. ¶¶ 36, 38, 62, 129 &162.  Without question, postage is a "product" under the PAEA, and not one exclusively reserved to functions of the statutory mail monopoly, extending to all classes and types of mail.  Further the CARS System and CARS Label Rolls are "products" as that term is used in the sovereign immunity waiver.

As demonstrated below, the prepayment of postage utilizing the CARS System, a Postal Evidencing System ("PES"),[6] and the labels on which the postage is printed are unquestionable a "postal services" as they are a "function ancillary" to the "delivery of letters, printed matter, or mailable packages."  It is therefore a statutory "product" if a rate is, or could be, applied.  39 U.S.C. 102(6).  Moreover, neither the Tying Product or Tied Product is required to be a postal "product" for the immunity waiver to apply – Plaintiffs only need to plead that USPS has "engage[d] in conduct **with respect to** any [postal] product."  39 U.S.C. § 409(e)(1).  Prepayment of postage is such a product and conduct regarding the CARS system is "with respect to" such prepayment.

Finally, USPS argues without statutory support that the waiver of sovereign immunity only applies to competitive, as opposed to market-dominant, products.  Likewise, it claims that the waiver applies only to products sold directly to the public.

---

[6] USPS goes to great lengths to demonstrate that CARS is a Postage Evidencing System ("PES"), and Plaintiffs assume, for the purpose of this Response, that it is.  Plaintiffs further assume that this System includes the component parts as alleged in the Amended Complaint ¶¶ 32-34, 47, 64-65, 119 & 140.  Plaintiffs, however, contest USPS's claim that a PES consists of three "components" making the "system", or that the labels on which postage is printed are "part" of the CARS System.  While the PES labels must be tested, there is no requirement that they be tested with the any other part of the PES, or that the supplier of the PES is or must be the sole supplier.  *See* 39 C.F.C. 501 *et. seq.* They simply must be approved by the Manager of Postal Technology Management.  DMM 604.4.8.11.   Indeed, the fact that the CARS Label Rolls must be purchased separately by the CPUs, while USPS is responsible for providing the CARS System makes clear that the labels are not a component of the systems.  *See* Am. Comp. ¶ 24; Motion at 23-24.

These arguments are belied by the express language of the statute, and contrary to both the plain meaning, intent and legislative history of the PAEA.

> B.    The PAEA does not Exclude USPS's Universal Service Obligation from the Immunity Waiver; by Definition, all Services Provided by USPS are Postal Services, and thus can be "Products."

The purpose of the PAEA was multifold.  It was intended to permit the Post Office flexibility in rate setting where USPS provides products that are competitive in nature, thus not having to undergo extensive rate setting procedures in such instances. *See* S. Rep. No. 108-318, at 1, 108TH Cong., 2ND Sess. 2004, 2004 WL 3044798 (Leg. Hist.). Congress also wished to prevent USPS from utilizing products and services in markets where USPS enjoys a statutory or *de facto* monopoly to supplement or pay for products and services in which it is a market competitor.  *Id.*

The PAEA has another function, to migrate the USPS out of the business of providing, selling and dealing in nonpostal products.  *See* S. Rep. No. 108-318, at 5-6. After 2008, Congress required the USPS and the Postal Regulatory Commission ("PRC") to categorize every service provided by USPS into two categories, postal services and nonpostal services.  39 U.S.C. § 404(c); 39 U.S.C. § 404(e)(1) (a nonpostal services is "any service that is not a postal service defined in 39 U.S.C. § 102(5)"); *see also* PRC Docket No. MC2008-1, Review Of Nonpostal Services Under The Postal Accountability And Enhancement Act, Order No. 154, at 1 (Dec. 18, 2008) (hereinafter "PRC Order 154").  After that categorization, all postal services were required to be further divided

8

into "market-dominant" or "competitive."  39 U.S.C. §§ 404(c) & 3621, 3631 & 3642(e).

As explained more fully below, the result is that, as of 2008, every single service offered

by USPS is now a "postal service".  Simply put, if USPS does something, it is a "postal

service."  And, if it is a postal service, it is included as a *product* on the market-dominant

or competitive list.  39 U.S.C. § 3641(e).  USPS cannot logically claim that the CARS

System and CARS Label Rolls, postage or the prepayment of postage are not "products"

because it is undisputed that USPS has a CARS CPU network, such activity is an

authorized postal service under the PAEA.  While these are all services that are part of

the universal service obligation, they are nevertheless "postal services", and therefore by

definition products if a rate is or reasonable could be applied.  39 U.S.C. §102(6).  As

discussed fully below, the plain reading of the PAEA as a whole comports with this

result.

In its attempt to characterize the CARS CPUs as non-postal services, USPS

ignores the fact that "postal services" "refers to the delivery of letters, printed matter, or

mailable packages, including acceptance, collection, sorting, transportation, *or other*

*functions ancillary thereto*."[7]  39 U.S.C. § 102(5)(emphasis supplied).  CARS CPUs and

the CARS System are clearly "postal services" because they are "ancillary functions" that

---

[7] As described more fully below, the prepayment of postage using the CARS System or any
other postal evidencing system have been held by the PRC to be a "function ancillary" to the
"delivery of letters, printed matter, or mailable packages, including acceptance, collection,
sorting, transportation," and are a "special service," an enumerated "product" on the market-
dominant list of products.

are necessary to the delivery, acceptance, collecting, sorting and transportation of packages.

C.    Congress Waived the USPS's Sovereign Immunity from Antitrust Law for All Conduct with the Exception of the Carriage of Letter Mail.

USPS's convoluted, confusing and strained statutory interpretation suggesting it has not waived immunity for the conduct set forth in the Amended Complaint is unsupported by law or any canon of statutory interpretation.  It argues that the waiver of immunity is narrow, not broad.  To support its claim, USPS embeds words and requirements into the waiver of sovereign immunity that simply do not exist. Specifically it contends that to be a "product" under the PAEA, the postal service must be provided directly to the "public" and it must compete against products offered by private companies such as Fed Ex and UPS.  Motion at 5, 13, 14, & 18.  Notably absent from USPS's Motion is a single citation to statute or regulation supporting its claims that a "product" must be provided to the public or compete against similar product.  USPS's unsupported conclusion is in error.  The Congressional waiver of sovereign immunity and declaration that the USPS is a "person" for the purpose of antitrust liability is plainly applicable here.

1.    The Plain Language of the Statute Rejects USPS's Arguments.

It is axiomatic that in construing a statute a Court must begin with its text.  *Ramah Navajo Chapter v. Salazar*, 644 F.3d 1054, 1062 (10th Cir. 2011) (citing *Chickasaw Nation v. United States,* 208 F.3d 871, 876 (10th Cir. 2000) "If the terms of the statute are

clear and unambiguous, they are controlling absent rare and exceptional circumstances."

*Id.*  Courts must "ordinarily resist reading words or elements into a statute that do not

appear on its face." *Bates v. United States,* 522 U.S. 23, 29, 118 S.Ct. 285, 139 L.Ed.2d

215 (1997) (declining to read an "intent to defraud" requirement into 20 U.S.C. §

1097(a)).  To add on a presumption that the "product" must be "sold to the public" and

"competitive" goes far beyond the plain meaning of the obviously complete waiver of

immunity, and is improper. *See id.*

There is no ambiguity in the immunity waiver in this case.  The PAEA specifically

waived USPS's sovereign immunity for ***any*** conduct and relating to all products (defined

as "postal services") provided by USPS, saving only one narrow exception to which

immunity still applies – the carriage of letter mail over postal routes.  Specifically, the

immunity wavier reads:

> **(e) (1)** To the extent that the Postal Service, or other Federal agency acting on behalf of or in concert with the Postal Service, engages in conduct **with respect to *any*** product which is not reserved to the United States under section 1696 of title 18, the Postal Service or other Federal agency (as the case may be) –
>> **(A)** shall not be immune under any doctrine of sovereign immunity from suit in Federal court by any person for any violation of Federal law by such agency or any officer or employee thereof; and
>> **(B)** shall be considered to be a person (as defined in subsection (a) of the first section of the Clayton Act) for purposes of –
>>> **(i)** the antitrust laws (as defined in such subsection); and
>>> **(ii)** section 5 of the Federal Trade Commission Act to the extent that such section 5 applies to unfair methods of competition.

For purposes of the preceding sentence, any private carriage of mail allowable by virtue of section 601 shall not be considered a service reserved to the United States under section 1696 of title 18.[8]

a.  The plain meaning of "any" means an all-inclusive waiver.

The plain language is clear – if USPS engages in conduct with respect to *any* product and that product is not exclusively related to the delivery of letter mail to addressees, USPS is not immune under *any* doctrine of sovereign immunity and is a "person" for purposes of the antitrust law.  "The Supreme Court has drawn upon the word 'any' to give the word it modifies an 'expansive meaning' when there is 'no reason to contravene the clause's obvious meaning.'" *New York v. E.P.A.*, 443 F.3d 880, 885 (D.C. Cir. 2006) (internal citations omitted). It is "usually understood to be all inclusive." *Natural Res. Def. Council v. E.P.A.*, 489 F.3d 1250, 1257 (D.C. Cir. 2007) (citation omitted).

b.  Congresses considered and rejected language that would have resulted in the interpretation proposed

If Congress had intended to do what USPS argues – *i.e.* provide a limited waiver of immunity only as it related to competitive postal products sold directly to the public – it would have done so.  Congress considered and rejected this limitation on the immunity

---

[8] 18 U.S.C. § 1696, also known as the Private Express Statute, is the source of the postal monopoly.   The PAEA's statutory recognition of various exceptions to the postal monopoly "effectively limits the postal monopoly to the delivery to the addressee."  Postal Regulatory Commission, Report on Universal Postal Service and the Postal Monopoly, 33-35 (2008) ("2008 USO Report").  The postal monopoly is the only postal service over which Congress granted USPS immunity from the antitrust laws.  39 U.S.C. § 409(e).  USPS admits this fact. *See* Motion at 5.

waiver.  A prior version of the PAEA considered by the House of Representatives

Committee on Government was limited to only "competitive" products.  *See* H.R. Rep

No. 109-66, pt. 1, 109TH Cong., 1ST Sess. 2005, 2005 WL 1848530 at *17-18 (Leg.

Hist.) (proposed waiver of immunity in 409(e) limited to the extent USPS "engages in

conduct with respect to any competitive product").  This is not the version of the

sovereign immunity waiver enacted.  *See* 39 U.S.C. §  409(e).  USPS, however, cites to

the legislative history of this version to support it claim that Congress intended a waiver

only to competitive products.  Motion to Dismiss at 18.  The judiciary "must enforce the

rules as enacted" and cannot add terms that the Congress has "understood, considered and

rejected" in another iteration of the bill. *United States v. Benally*, 546 F.3d 1230,

1239 (10th Cir. 2008) (quoting *Tanner v. United States*,  483 U.S. 107, 125 (1987)).

　　Likewise, if the immunity waiver intended to exclude postal services that were

part of the "core functions" of USPS or part of its universal service obligation, it would

have expanded the single referenced exception to the immunity waiver to include conduct

with respect to any product which relates to 39 U.S.C. §§ 101 & 403 and 404, the

sections of the statute creating the universal service obligation.  *See e.g.*  Motion at 5-6

(discussing universal service obligation); *see also* 2008 USO Report at 4 (discussing

statutory basis for universal service obligation). Congress did not include these

exceptions, and to add them goes beyond the plain meaning of the statute.

These limitations to the immunity waiver were not adopted because the waiver was intended to be complete, broad, and all-encompassing of all postal services, market-dominant and competitive, excepting only products related exclusively to the statutory postal monopoly.   Indeed the very legislative history cited by USPS regarding the version of the waiver that was actually enacted states "all Postal Service activities outside the postal monopoly are subjected to federal antitrust laws and all prohibitions on unfair competition and *eliminates* sovereign immunity protection from suits in Federal Court for violations of Federal law."  *See* S. Rep. No. 108-318, at 17-18 (emphasis supplied). Congress may have been "particularly" concerned about competitive product.  *Id.* What it chose to enact, however, was a waiver of immunity with regard to any anticompetitive conduct.  39 U.S.C. §409(e).

> c.   Under the Cannon of *Expressio Unius est Exclusio Alterius*, the Only Products Excluded from the Immunity Waiver are those Related exclusively to the postal monopoly.

The plain language further makes clear that Congress intended the waiver as an all-inclusive waiver of sovereign immunity with one exception, rather what was complete antitrust immunity under *United States Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 748 (2004) ("*Flamingo*").  "Where Congress explicitly enumerates certain exceptions to a general prohibition; additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001)

(quoting *Andrus v. Glover Constr. Co.,* 446 U.S. 608, 616–617 (1980).  Because

Congress enumerated one exception without any others, there are no other exceptions.

> d.  Section 409(e) is an abrogation of *Flamingo*

USPS argues that its sovereign immunity as defined by *Flamingo* still exists.  It

does not. Courts must presume that "[w]hen Congress acts to amend a statute . . . it

intends its amendment to have real and substantial effect." *Stone v. I.N.S.*, 514 U.S. 386,

397 (1995); *see also Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547

U.S. 47, 57-58 (2006) ("We refuse to interpret the [statute] in a way that negates its

recent revision, and indeed would render it a largely meaningless exercise."); *Heintz v.*

*Jenkins,* 514 U.S. 291, 294 (1995) (stating that a "rather strong reason[ ] for believing

that the Act applies" to a particular group is the fact that an express exemption for the

group had existed in the prior enacted version of the statute, but "Congress repealed [that]

exemption in its entirety").  The normal presumption is that an amendment is intended to

change the law as it formerly existed, rather than to reaffirm it.  *In re Kukowski*, 356 B.R.

712, 715 (B.A.P. 8th Cir. 2006) (when the Legislature amends a statute that substantively

differs from a prior and recent judicial interpretation of the same statute, a court should

infer that the Legislature intended to overrule the judicial construction of the statute

announced in that prior case).

Here, Congress specifically acted to change the statute concerning USPS's right to

sue and be sued as it relates to antitrust law.  The precise holding of *Flamingo* was that

USPS was not a "person" for purposes of the antitrust laws, and Congress had not

intentionally and expressly waived its immunity from antitrust laws. *Flamingo*, 540 U.S. at 746. The PAEA, in the most specific possible terms, enacted the contrary provisions specifying that USPS "shall be considered a person" and going farther to state that it "shall not be immune under any doctrine of sovereign immunity from suit in Federal court." 39 U.S.C. § 409(e). The language used in the PAEA is an express abrogation of *Flamingo's* holding on its precise terms. And, a broader immunity waiver is hardly imaginable.

To read the statute in the manner urged by USPS flies in the face of the plain language, ignores Congress' use of the all-inclusive term "any," espouses an interpretation explicitly rejected by Congress, and violates the plain meaning of the statute and almost every canon of statutory construction.

    D.    <u>The Prepayment of Postage using Postal Evidencing Systems such as CARS is a Function Ancillary to the delivery of letters, printed matter, or mailable packages</u>.

In an attempt to overcome the effect of Congress' express waiver of sovereign immunity, USPS claims that the CARS System is not a "product" under the PAEA, and that no other "products" are at issue in the Amended Complaint. This is simply inaccurate. The CARS System need not itself be a postal "product"– if the conduct alleged (tying the provision and use of the CARS System to purchase of only IGI Label Rolls) is "*with respect to*" a postal "product," immunity has been waived.

As set out in the PAEA, a postal "product" under the statute is any "'postal service' with a distinct cost or market characteristic for which a rate or rates are, ***or may***

*reasonably be*, applied." 39 U.S.C. § 102(6) (emphasis added).  In turn, a "postal service" "refers to the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, *or other functions ancillary thereto.*" 39 U.S.C. § 102(5).  "'[R]ates' as used with respect to products, ***includes*** fees for postal services.'"[9]  The only allegations required to demonstrate that there is no sovereign immunity with respect to the conduct alleged is that a) USPS has engaged in conduct with respect to any postal product; and b) a rate is or could reasonably be applied to that postal product.

First, "postage" sold to CPUs is the quintessential postal "product," and a tying product as alleged in the Amended Complaint.  Second, the prepayment of postage using a postal evidencing system is without question a postal service – a function ancillary to the delivery of letters, printed matter or mailable packages.  Notably, until filing its Motion to Dismiss, USPS consistently maintained in the Domestic Mail Classification Schedule and its arguments to the PRC that prepayment of postage utilizing a PES system *is* a postal service.

　　　　1.　　USPS cannot claim that "postage" is not a "product."

The Motion to Dismiss must be denied for the simple reason that Plaintiff pleaded postage as one of the USPS Tying Products.  Am. Comp. ¶¶ 38, 62, 129 & 162.  That is,

---

[9] USPS attempts to limit the definition of "rates" citing to a 1979 Third Circuit opinion relating to entirely different issues.  Motion at 14.  The term "rates" as it relates to "products" under the PAEA is a specifically defined term created in the PAEA.  It includes, but is not limited to, the specific fee paid postal services.

USPS has conditioned the selling of postage to CARS CPUs (both metered postage and stamps) on CPUs purchasing CARS Label Rolls only from IGI, or refraining from dealing in the goods of any other company distributing CARS Label Rolls.  Although CARS CPUs generally sell postage to third parties, the CARS CPUs first purchase and prepay for the postage through a debit account.  *See* Am.  Comp. ¶ 62 and Exhibit 1, Part 3 (Contracting Clauses) ¶ 3.9.  Postage is the quintessential item to which a "rate" is applied.  Indeed, in the 10 references to "postage" in the PAEA, 9 of them refer to the "rates of postage."  *See* 39 U.S.C. §§ 3626(a)(1),(3),(4)(A)&(B) & 404(b).  Postage is required for the "delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation," and is a required function ancillary to those services.  *See* 39 U.S.C. § 102(5); PRC Docket No. MC2008-1, Review of Nonpostal Services Under The Postal Accountability and Enhancement Act, Order No. 154, at 1 (Dec. 18, 2008) (hereinafter "PRC Order 154") ("The payment of postage is a prerequisite to the carriage of mail. Without it, service is not possible.").  The Amended Complaint alleges antitrust violations with respect to USPS's conduct relating to this product, requiring denial of the Motion to Dismiss.

> 2.     The Tying Product is not required to be a Postal Product for the immunity waiver to apply.

USPS conflates two completely separate concepts, statutorily defined postal "products" and the Tying Product, in support of its claim that it can only engage in antitrust violations if the Tying Product itself is a postal "product."  Again, this ignores

the plain meaning of the immunity waiver in the statute.  The statute reads "To the extent that the Postal Service . . . engages in conduct **with respect to** any product . . ." 39 U.S.C. § 409(e) (emphasis supplied).   The plain meaning of "with respect to," is synonymous with as to, concerning, in relation to, regarding, with reference to or with regard to.  *Khan v. United States.*, 548 F.3d 549, 556 (7th Cir. 2008) ("synonyms for 'with respect to' include 'pertaining to' and 'concerning.'") (*citing Encarta World English Dictionary* (2007)); *see also* Merriam Webster's Collegiate Dictionary, 10th Edition (1997) (synonyms for respect include concerning, with reference to, in relation to).  This means the tying arrangement must relate to a postal product, not that the Tying Product must **<u>be</u>** a postal product.

Of course, the sovereign immunity waiver does not just relate to antitrust tying violations; it applies to all antitrust laws.  This includes bid rigging, price fixing, predatory pricing practices, creation of non-statutory monopolies, and other restraints of trade.  *See generally* 15 U.S.C. §§ 1-38.  It just so happens that in this case, a tie-in case, Plaintiffs are required to identify a Tying Product and a Tied Product, concepts determined by substantive antitrust law without regard to the immunity waiver in 39 U.S.C. § 409(e).[10]  *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 461 (1992) ("A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least

---

[10] Notably, under the Sherman Act § 1, the tying and tied items need not be commodities – they can be products or services.  *See e.g. Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 463 (1992) (tying arrangement concerning Kodak parts and repair services).

agrees that he will not purchase that product from any other supplier.'"  The Tied Product and Tying Products need not be postal "products" – a statutory term of art – so long as the conduct alleged is with respect to something that is a postal product.

3.     The Use, Provision and Regulation of PESs must be a Postal Product, or USPS is prohibited from Providing such Systems.

As discussed above and demonstrated further below, a PES such as the CARS System (the Tying Product) meets the statutory definition of a postal product.  Even accepting USPS's claims that the Tying and Tied Products alleged are merely "equipment and tools" that are "an aspect of the Postal Service's own operations and an integral part of its efforts to fulfill its universal services obligation" (Motion at 14), they are nevertheless subject to the antitrust law.  The dealings, manner and methods of utilization and distribution of that equipment and those tools are conduct with respect to a postal product, the prepayment of postage.  Am. Comp. ¶ 36.

USPS's own argument proves that prepayment of postage utilizing a PES *is* a "product" because it is a "postal service."  If it wasn't, USPS could not deal with, provide or regulate the use of PES systems.  *See* Motion at 15-18.  As explained above, as of 2008, USPS is prohibited from providing *anything but* "postal services."  USPS and the Postal Regulatory Commission ("PRC") categorized *everything* touched by USPS into two categories, postal services and non-postal services.  39 U.S.C. §404(c); 39 U.S.C. § 404(e)(1) (a non-postal services is ""any service that is not a postal service defined in 39

U.S.C. § 102(5)"); *see also* PRC Docket No. MC2008-1, Review Of Nonpostal Services

Under The Postal Accountability And Enhancement Act, Order No. 154, at 1 (Dec. 18,

2008) (hereinafter "PRC Order 154").

From that categorization, all postal services were required to be divided into

market dominant or competitive. 39 U.S.C. §§ 404(c) & 3621, 3631 & 3642(e).  By 2008,

for all nonpostal services the PRC would determine if such service could continue to be

provided by USPS, and if so whether it would be added to the market dominant or

competitive *product* lists, codified in the Mail Classification Schedule.  39 U.S.C. 404(c).

If it determined that such service was not needed by the public or that the private sector

was able to meet the public need, USPS would be prohibited from continuing to provide

such nonpostal service. 39 U.S.C. § 404(c)(3)-(4); 3642(e).  Indeed, the PAEA requires

that "[e]xcept as provided in section 3641 [experimental products], no product that

**involves** the physical delivery of letters, printed matter, or packages may be offered by

the Postal Service unless it has been assigned to the market-dominant or competitive

category of mail (as appropriate) either— (1) under this subchapter; or (2) *by or under*

*any other provision of law.*" 39 U.S.C 3641(e) (emphasis supplied).  It is undisputed that

USPS provides and regulates the use of PES systems pursuant to statutory authorization –

the statutory provisions permitting USPS to determine the amount of postage and the

manner in which it is paid are found at 39 U.S.C. §§ 404(a)(2) &(4)).  As all postal

services are either "market-dominant" on "competitive" *products*.  The prepayment of

postage is a USPS product.

This conclusion is supported by the Domestic Mail Classification Schedule, which

defines the Prepayment of Postage as a Postal Service.  The predecessor document for the

Mail Classification Schedule ("MCS") identifying market-dominant and competitive

products was the Domestic Mail Classification Schedule ("DMCS").[11]  The DMCS

specifically identifies and includes the prepayment of postage through meters and other

methods as "postal products."  *See* DMCS § 3040.[12]  Under the express language of the

sovereign immunity waiver, USPS is subject to the antitrust laws of the United States

with regard to its dealings in such products.

Finally, USPS has previously admitted that the prepayment of postage is a product

as defined by 39 U.S.C. § 102(5).  *See* Initial Brief of the United States Postal Service,

Docket No. MC2008-1, September 10, 2008.[13]  In fulfilling the statutory mandate to

define all "postal services" and "non-postal services" as required by 39 U.S.C. § 404(c),

---

[11] *See* 39 U.S.C. § 3020.12 (Publication of the Mail Classification Schedule, stating the MCS will "also [be] available on the Internet at http://www.prc.gov").  The current publication of the MCS on the http://www.prc.gov/prc-pages/library/mail-classification-schedule/default.aspx?view=mail contains the DMCS, not the MCS, and states "The Domestic Mail Classification Schedule is the predecessor to the Mail Classification Schedule. It governed rates and classifications of domestic ***postal products*** prior to enactment of the Postal Accountability and Enhancement Act (PAEA), Pub. L. 109-435, 120 Stat. 3198, December 20, 2006.").

[12] "**3040 Methods for Paying Postage and Fees** Postage for all mail may be prepaid with postage meter indicia, adhesive stamps, permit imprint, or other payment methods specified by the Postal Service. Prior authorization for use of certain payment methods may be required, as specified by the Postal Service. A fee is charged for authorization to use a permit imprint, as set forth in Schedule 1000).

[13] http://www.prc.gov/Docs/60/60954/Aggregate.Final.Initial.Brf.pdf

the PRC underwent extensive briefings and hearings to delineate what was and was not a "postal service," and what nonpostal services USPS could continue to provide.  *See* PRC Docket No. MC2008-1.  Through these briefings, USPS argued that "Custom Postage" that permitted the prepayment of postage through a PC Postage (a PES) provider, with the inclusion of a company logo, was a "program ancillary to the delivery of mail." Initial Brief of the United States Postal Service, Docket No. MC2008-1, September 10, 2008, p. 103.  Because only USPS could authorize participation, it requested that it be categorized as a market-dominant "product," and assigned to the "special services" class in the MCS.  *Id.*  And, the PRC agreed.  As noted by the PRC:

> The postage meter is a forerunner to Customized Postage.
> . . .
> In its simplest terms, Customized Postage represents a form of postage prepayment, a core function of the Postal Service. *See* 39 U.S.C. §§ 404(a)(2) and (a)(5). In that regard, it is indistinguishable from the *prepayment of postage via postage meters*, *a long-recognized special postal service*.[14] The payment of postage is a prerequisite to the carriage of mail. Without it, service is not possible. Accordingly, customized postage is a postal service.  Given the Postal Service's licensing and oversight responsibilities regarding Customized Postage, it will be classified as market-dominant subject to the outcome of the pending classification proceeding.

*See* Review Of Nonpostal Services Under The Postal Accountability And Enhancement Act, at 40.

In light of USPS's admission, it cannot now claim that postage prepayment *is not* a postal service simply to avoid the waiver of sovereign immunity.  Additionally, because the PRC is the agency charged with the interpretation and implementation of the PAEA,

---

[14] Notably "special services" are a defined as a "product" identified in 39 U.S.C. § 3621(a).

its determination that the prepayment of postage is a "postal service" is binding, or at a

minimum entitled to substantial deference.  *United States Postal Service v. Postal*

*Regulatory Com'n*, 599 F.3d 705, 710 (D.C. Cir 2010) (the PRC is given *Chevron*

deference on issues delegated to it in the PAEA).

       E.    Rates are Applied to the Prepayment of Postage using a PES, or Could
             Reasonably be Applied.

      Having established that the prepayment of postage through use of a PES is a

"postal service" the final question is if it is a "product" to which a "rate or rates are, *or*

*may reasonably be*, applied."  39 U.S.C § 102(6) (emphasis added).  Plaintiffs have

specifically pleaded that a rate could be applied to the prepayment of postage through use

of the CARS System, which is sufficient to overcome the Motion to Dismiss.  *Christy*

*Sports, LLC v. Deer Valley Resort Co., LTD*., 555 F.3d 1188, 1191-92 (10th Cir. 2009)

("The concept of 'plausibility' at the dismissal stage refers not to whether the allegations

are likely to be true; the court must assume them to be true.").

      What is more, rates (fees) actually *are* regularly applied to this postal service

(prepayment of postage), making it clear that they "may reasonably be applied."  For

example, USPS charges registration and yearly fee for Imprint Indicia utilizing a PES.

*See* MCS §1505.2.2, http://www.prc.gov/Docs/71/71852/mcs.pdf.   Rates are charged for

"Customized Postage" that the PRC found "indistinguishable from the prepayment of

postage via postage meters, a long-recognized special postal service."  MCS §1555.2,

http://www.prc.gov/Docs/71/71852/mcs.pdf.  The USPS's own rates on prepayment

options requires determination in Plaintiffs' favor.

### III.   Plaintiffs Have Met the Pleading Requirement to State Antitrust Violations.

USPS's secondary argument that the Amended Complaint is insufficient under

substantive antitrust law fundamentally fails when reviewed under the appropriate

Motion to Dismiss standard.  "No heightened pleading requirements apply in antitrust

cases.  '[A] short plain statement of a claim for relief which gives notice to the opposing

party is all that is necessary in antitrust cases, as in other cases under the Federal Rules.'"

*Todd v. Exxon Corp.*, 275 F.3d 191, 198 (C.A.2 (N.Y.),2001) (quoting *George C. Frey*

*Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.,* 554 F.2d 551, 554 (2d

Cir.1977)).  Furthermore, "[i]n antitrust cases in particular, the Supreme Court has stated

that 'dismissals prior to giving the plaintiff ample opportunity for discovery should be

granted very sparingly.' "  *Id.* (quoting *George Haug Co. v. Rolls Royce Motor Cars*

*Inc.,* 148 F.3d 136, 139 (2d Cir.1998) (quoting *Hosp. Bldg. Co. v. Trs. of Rex Hosp.,* 425

U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976))).  Courts hesitate to grant motions

to dismiss for failure to plead a relevant product market because market definition is a

deeply fact-intensive inquiry.  *Id.*(collecting cases).  The elements of each of Plaintiff's

claims have been pleaded with far more particularity than required to state a claim for

relief.  USPS is on notice of the claims alleged.  Plaintiffs are entitled to discovery to

prove the appropriate markets and USPS's interest in the Tied Product.

Further, contrary to Plaintiffs' assertions, there are multiple different elements in Sherman and Clayton Act tie-in cases.  Likewise, the anti-monopolization requirements found in Section 2 of the Sherman Act (Count IV of the Amended Complaint) do not require proof of a tie-in to state a claim, and USPS has not challenged the sufficiency of this claim.

A.    <u>Plaintiffs have alleged Multiple Valid Tying Products.</u>

USPS argues that the fact that it does not sell CARS to CPU operators renders the tying arrangement impossible because "something that is not sold cannot be a tying product."  Motion at 23.  USPS's argument is fundamentally flawed by its unilateral and incorrect interpretation that the Amended Complaint only identifies CARS as the Tying Product.  On the contrary, the Amended Complaint identifies numerous Tying Products, including the postage sold to CPU operators.  *See* Section D1, *supra*.  It is clear that the sale of postage to CPU operators is conditioned on the purchase of IGI Label Rolls; the fact that CARS System itself is not sold by the USPS is irrelevant.  Plaintiffs have sufficiently pled that USPS is using, *inter alia*, its sale of postage to tie.  Further, both Counts I and III allege that IGI has conditioned the lease of the CARS System on the tying arrangement, which by definition states a claim under the Clayton and Sherman Acts.  *See*  15 U.S.C. 14 ("It shall be unlawful for any person engaged in commerce . . . to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or

resale . . . on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities . . .")

Additionally, USPS's assertion that the Tying Product actually be sold is incorrect.  The Tying Product needs only to have market value to the consumer, sufficient to enable the defendant to exploit the market demand for the tying product to force purchase of the tied product.  *Kodak*, 112 S. Ct at 2079 (citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21-22(1984)).  The market-value focus applies even if the tying product is given for free; provided the tying product possesses sufficient value to the consumer, a tying claim may be sustained.  *See Lucas Indus., Inc. v. Kendiesel, Inc.*, No. 93-cv-4480, 1995 WL 350050, at *4 (D.N.J. Jun. 9, 1995) (denying motion to dismiss tying claim based on defendant's alleged exploitation of demand for free product to force buyers into purchase of tied product).  Obviously, there is a market demand for accepting the "free" CARS System enabling the ability to operate a CARS CPU.  That demand is created by the potential for increased foot traffic that is promised for being able to provide postal services at postal prices.  Amended Complaint ¶¶ 18-21.  If there were no value to accepting the "free" CARS System, there would be no CPUs.

B.     The CARS CPU Market is a Valid Tying Product Market.

USPS next argues that the relevant market for the Tying Product – users of the CARS System – is impermissibly narrow because it limits the market only to the "specific equipment provided."  Motion at 24.

As a threshold matter, Courts have universally held that the relevant market "is a component of substantive antitrust law" to be determined on the merits as a jury question.  *Behrend v. Comcast Corp.*, 655 F.3d 182, 192 (3d Cir. 2011).  When considering the relevant markets for the tying and tied products, the market selected must "correspond to the commercial realities of the industry." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336-37 (1962).  The basic test for product market definition is "reasonable interchangeability."  *Telecor Commc'ns, Inc. v. Southwestern Bell Tel. Co.*, 305 F.3d 1124, 1131 (10th Cir. 2002).  Of course, where reasonable interchangeability exists, the relevant market definition may not be so narrow as to create a product market consisting solely of the defendant's product.  *Green Country Food Market, Inc. v. Bottling Group, LLC*, 371 F.3d 1275, 1283 (10th Cir. 2004).  However, the inverse is true.  Where, as here, there is no reasonable substitute product, a complaint is *not* subject to dismissal under Rule 12(b)(6) if it sufficiently alleges as much.  *Christou v. Beatport, LLC*, 849 F. Supp. 2d 1055, 1065 (D. Colo. 2012) (denying motion to dismiss for failure

to sufficiently define relevant markets because plaintiff alleged "no reasonable substitutes" existed).

Here, the Amended Complaint makes abundantly clear the fact that there are no reasonable substitutes for the CARS System.  Am. Comp., ¶ 60.  Indeed, USPS distributes 100% of the CARS Systems in the CARS user market and it requires all CARS CPUs to utilize the CARS System.  *Id.*, ¶¶ 44, 45.  There are no other sources of postal evidencing systems available to CPU operators, thus the relevant market definition for the Tying Product suffices.  Unlike the cases relied on by Plaintiff rejecting a single manufacturer product market, there is no alternative to contracting with USPS that would permit one to sell postage at postage prices.  This is not a case such as *United Farmers Agents Ass'n v. Farmers Ins. Exchange*, 89 F.3d 233, 236-37 (5th Cir. 1996), where there were alternatives to contracting with *Farmers* in the market for insurance sales if you want to sell insurance.  Here, there is no other alternative.  If one wants to sell United States postage and other postal services at postal prices, one must contract with USPS.  Amended Complaint ¶¶ 26, 39-45.  Plaintiffs have adequately defined the tying market and they are entitled to prove the market alleged is proper under this this unique set of facts.

> C.   Plaintiffs have Pleaded that USPS Has a Direct Economic Interest in the Tied Product.

USPS admits in its motion that no tying product seller would impose a tie for another party's product such as one it has imposed on IGI CARS Label Rolls, unless it

was receiving an overall economic benefit from the required tie.  Motion at 27.  This is

precisely the reason why the direct sale of the tied product by the tying product provider

is not required, and why proof of a direct economic benefit from the tied product is ***not***

required by the Supreme Court to demonstrate a *per se* antitrust tying violation.  *Jefferson*

*Parish Hosp. Dist. No. 2 v. Hyde*,  466 U.S. 2, 12, 104 S.Ct. 1551, 1558 (1984).  While

the element of an economic interest in the tied product has been cited by many courts, it

is not required under Supreme Court jurisprudence, and should not be an element

essential to a tying violation.  As pointed out by the Second Circuit:

> A majority of the Supreme Court has as yet cut back on the application of tie-in
> doctrine by incorporating this additional [economic interest in the tied product]
> requirement into the test for an illegal tying arrangement.  Instead of focusing its
> analysis on the tying entity's interest in or profit from the tied market, the majority
> in *Jefferson Parish* focused primarily on the anticompetitive effect of tying
> arrangements and the resultant harm to consumer choice in the tied-product
> market. In protecting those interests, the majority in *Jefferson Parish* appeared to
> require a plaintiff to prove only that the tie impairs competition in the tied market
> and forecloses a substantial volume of commerce in that market. The majority in
> *Jefferson Parish* does not require any "economic interest" by the tying seller in the
> tied-product market.

*Gonzalez v. St. Margaret's House Housing Development Fund Corp.*, 880 F.2d 1514,

1517(2nd Cir. 1989) (internal quotations and citations omitted).

As alleged in the Amended Complaint, USPS has and continues to use its

exclusive economic power in the Tying Product market to foreclose competition in the

Tied Product market, affecting consumers and competition in that market – i.e.

restraining trade.  That alone is enough under Supreme Court precedent to demonstrate

per se illegality.  The "essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.  When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." *Jefferson Parish*, 466 U.S. at 12.  The evil intended to be avoided by prohibition of tie-in arrangements is the precise sin USPS has committed – foreclosure of competition in the tied product market through use of its market dominance.  Whether it receives a direct or indirect kick-back from this conduct is of no moment – the antitrust laws were intended to prevent such wrongs.

This Circuit has included the tying product provider's economic interest in the tied product as an element of a federal antitrust tying violation. *See Sports Racing Services, Inc. v. Sports Car Club of America, Inc.* 131 F.3d 874, 887 (10th Cir. 1997) (discussing economic interest test where tied product was sold by third party, and holding tying product seller has an economic interest, permitting tying claim).  In light of this dissonance in the case law, Plaintiffs have pleaded a direct economic benefit flowing from the tied product to USPS.  Amended Complaint ¶¶ 94, 97 & 131.  That pleading requirement is premised on USPS's own documents attached to the Amended Complaint.  USPS *tested and approved* a competitive lower cost product to IGI's CARS Label Rolls.  It then revoked that approval, claiming it was invalid, because to permit the additional

authorized provider would "bind the Postal Service to spend money concerning contract matters involving the IGI contract" without the IGI contracting Officer's approval. Amended Complaint ¶ 94.  The USPS has admitted, or at least claimed, that it is ***directly*** benefiting (not having to spend money) from tying the purchase of only IGI Label Rolls to the use and provision of the CARS System, and Plaintiffs have so alleged.  This benefit is sufficient to meet the element of a direct or indirect economic interest in the tied product.  *See Sports Racing Services, Inc.*, 131 F.3d at 888, (defendant found to have economic interest in independent distributors' sales of tied products where defendant was sole supplier to distributors of only cars and parts that could be used in defendant's car racing events); *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 835 (7th Cir. 1978) (payment of concealed rebates to Seller created economic interest).

       D.      <u>CARS Label Rolls are a Valid Tied Product Market</u>.

The Amended Complaint states that "the relevant Tied Product market is the CARS Label Roll market (including IGI CARS Label Rolls, Non-Tested CARS Label Rolls and CPUAA CARS Label Rolls (defined below)), sold to CARS CPUs throughout the United States.  CARS Label Rolls are interchangeable with each other."  Am. Comp. ¶ 61.  The term "sold to CARS CPU's throughout the United States" simply defines the geographic scope.  CARS CPUs are the only known purchaser of these label rolls – no other known user buys them, and no one other than CARS CPUs use the CARS System which would necessitate the use of the Rolls.  Regardless, the Tied Product Market

alleged is not limited to CARS CPUs; it includes all CARS Label Rolls and whoever buys them.  The definition of the market includes *all* CARS Label Rolls, whether approved or unapproved, and whether or not their use might result in an alleged breach of contract, the problem in the cases cited by USPS.  It is not limited to IGI Label Rolls.  It is a market, much like that in *Eastman Kodak* and *International Business Machines Corp. v. United States*, 298 U.S. 131 (1936) that is self-defining, and permissible – without accepting or purchasing the tying product, there would be no need for the tied product. Plaintiffs are entitled at this stage to plead this market, and prove this, or an eventually different tied product market.  Alternatively, if the court believes that the tied product market should be expanded, Plaintiffs should be permitted to amend the pleadings to do so.

### IV.    CONCLUSION

There is no question that if Congress has waived sovereign immunity for the conduct alleged in the Amended Complaint, USPS has committed antitrust violations.  As demonstrated, and as is clear by the plain language of 39 U.S.C 409(e), USPS's immunity has been stripped.  The Motion to Dismiss must be denied, and Plaintiffs are entitled to prove the claims alleged.

WHEREFORE, Plaintiff respectfully request that the Court Deny Defendant United States Postal Services' Motion to Dismiss the Amended Complaint, or in the alternative, permit Plaintiffs to amend their Complaint consistent with the Court's ruling.

Dated this the 19th day of November, 2012.

*s/Denise D. Riley*
Denise D. Riley
Stephen DeHoff
Friesen Lamb, LLP
1675 Larimer Street, Suite 675
Denver, Colorado 80202
Phone: 720.904.6000
Fax: 720.904.6006
Email: driley@friesenlamb.com
sdehoff@friesenlamb.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2012, I electronically filed the foregoing **PLAINTIFFS' RESPONSE TO UNITED STATES POSTAL SERVICE'S MOTION TO DISMISS FIRST AMENDED COMPLAINT** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Janine Castorina
U.S. Postal Service
475 L'Enfant Plaza, S.W.
Washington, D.C.  20260-1150
janine.castorina@usps.gov

Jeffrey S. Bucholtz
Graciela M. Rodriguez
Brian R. Meiners
Paul A. Mezzina
King & Spalding LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
jbucholtz@kslaw.com
grodriguez@kslaw.com
bmeiners@kslaw.com
pmezzina@kslaw.com

Kathryn A. Reilly
Christopher Brady
Husch Blackwell LLP
1700 Lincoln Street, Suite 4700
Denver, CO  80203
kathryn.reilly@huschblackwell.com
christopher.brady@huschblackwell.com

_s/Denise D. Riley_
Denise D. Riley
FRIESEN LAMB, LLP
1675 Larimer Street, Suite 675
Denver, CO 80202
Telephone: (720) 904-6000
Facsimile: (720) 904-6006
Email: driley@friesenlamb.com